# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 22, 2010 Session

## STATE OF TENNESSEE v. CLARENCE D. HAYES

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-B-1257    Seth Norman, Judge**

---

**No. M2008-02689-CCA-R3-CD - Filed December 23, 2010**

---

A Davidson County jury convicted the defendant of first degree felony murder, and he received a life sentence in the Tennessee Department of Correction.  On appeal, he argues that (1) the trial court denied his right to counsel at his motion for new trial hearing; (2) the evidence was insufficient to support his conviction; (3) the trial court erred by admitting evidence of the defendant's prior bad acts; and (4) the trial court erred by allowing a lay witness to provide expert testimony.  Following a thorough review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ, joined.

Paula Ogle Blair (on appeal), and David Collins and Scott Rich (at trial), Nashville, Tennessee, for the appellant, Clarence D. Hayes.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Sharon Reddick and Katie Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

In May 2006, a Davidson County grand jury indicted the defendant, Clarence D. Hayes, for the first degree felony murder of M.H.[1] The parties tried the matter before a jury in July 2008 and presented the following evidence.

*State's Proof.* Iola Hudson testified that she was the mother of Monique Greer and Tamika Hudson. She said that Tamika Hudson's nine-year-old son, M.H., was in third grade when he was killed. Ms. Hudson testified that Mrs. Greer had a daughter with the defendant, and they used her home as a "drop-off and pick-up point" for their daughter when the defendant had visitation. She said that the defendant told her that he hated Mrs. Greer's husband, William Greer, and that "[h]e had people that would do things."

The state requested a jury-out hearing to proffer testimony regarding a prior bad act of the defendant. After hearing the testimony, the trial court found that the evidence showed animosity between the parties involved and that the probative value outweighed the prejudicial effect. The court ruled that testimony regarding the prior bad act was admissible.

The state resumed Ms. Hudson's direct examination. She testified that on one occasion, the defendant stayed at her house after bringing his daughter there. Mr. and Mrs. Greer arrived to pick up the child, and when Ms. Hudson answered the door, the defendant "jumped up off the couch and pulled a gun out of his pocket and cocked it." Ms. Hudson said that she stepped between the defendant and the Greers, and she pushed the Greers outside.

On cross-examination, Ms. Hudson testified that the defendant's gun did not have a hammer. She said that she did not consider calling the police about the incident.

Monique Greer testified that she had one daughter with the defendant. She had two children with her husband and a fourth child from a previous relationship. Mrs. Greer testified that her sister, Tamika Hudson, had three children, one of whom was the victim in this case. Mrs. Greer explained that the court ordered the defendant to pay child support for their daughter, but he did not pay. She said that they repeatedly went to court about the child support payments. The relationship between her and the defendant worsened after she married Mr. Greer. The defendant "[c]onstantly" told her "[t]hat he wanted to F that young N up." He also told her that he wanted their family back together. Mrs. Greer said that the normal procedure when the defendant had visitation with their daughter was that Mrs. Greer would take their daughter to her mother's house, and the defendant would pick her up. On one occasion, the defendant was at Ms. Hudson's house when Mr. and Mrs. Greer arrived, and he pulled a gun on Mr. Greer. Mrs. Greer said that she had to push her husband outside.

---

[1] It is the policy of this court to refer to minors by their initials.

She testified that the defendant had a telephone harassment warrant taken out against her because she called him repeatedly to have him return their daughter to her after their daughter had called her saying that she wanted to come home. Mrs. Greer said that her "attorney got [the case] bound over to the grand jury and returned it was [sic] dismissed." Mrs. Greer recalled that on March 21, 2006, she and her husband went to court against the defendant. She denied vandalizing the defendant's Jeep Cherokee that day. That evening, she, her husband, her four children, and her nephew, the victim, were at her home. The children, except for the oldest who was in his room, were playing in the living room. She and Mr. Greer were preparing to go to bed when her daughter knocked on their bedroom door, saying that someone was at the door. Mr. Greer went to answer the door. Mrs. Greer testified that the next thing she recalled was her husband telling them to run because "he got a gun." She said that three of the children ran past her into a closet, and she hid behind a door. Her nephew told her that he had been hit, and he laid across the bed. She picked him up, took him to the hallway, and applied pressure to the wound. She went with him to the hospital after an ambulance came. Mrs. Greer said that she spoke to police that night and told them that she suspected the defendant.

On cross-examination, Mrs. Greer testified that she did not call police after the defendant pulled a gun on her husband because she "felt like [they] diffused the situation by leaving." She agreed that she attempted to take out an order of protection against the defendant in January 2006, but the court had issued a mutual stay-away order, effective for three months, instead. Mrs. Greer testified that the defendant had visitation with their daughter every other weekend. She said that it was her daughter's decision whether the defendant was in her life, but if it were her decision, she would not want the defendant in their lives.

William Greer testified that he had been married to Monique Greer for five years, and they had two children together. Mr. Greer said that his nickname was Shooby. He knew the defendant because Mrs. Greer had a daughter with him. Mr. Greer recalled that he had seen the defendant with a gun on one occasion. He testified that he and Mrs. Greer were picking up her daughter from her grandmother's house, and the defendant was there. He said that when they came through the door, the defendant jumped up from the couch and pulled out a small chrome .380 caliber semi-automatic pistol. Mr. Greer said that it did not have a hammer and was made by either Lorcin or Jennings.

Mr. Greer testified that he and his wife saw the defendant in court on March 21, 2006. He denied doing anything to the defendant's car that day. That evening, his nephew, M.H., was visiting the Greers' house. The children were playing in the living room, and he and Mrs. Greer were preparing to go to bed. Mrs. Greer's daughter knocked on the bedroom door and told them that someone was at the door. Mr. Greer said that he went to answer the door,

and two of the children followed him. He spoke to the man outside through the window next to the door. The man told him, "Tori sent me down here to give you something." Mr. Greer said that he looked down and saw that the man had a gun in his hand. He told the children to run. Mr. Greer said that the children ran by him, and he heard five to six shots. Mrs. Greer told him that M.H. was hit, but he did not believe her until she brought him into the hallway. Mr. Greer called 9-1-1. Mr. Greer said that the man shot through the door, and neither he nor the man opened the door. Mr. Greer said that he had never seen the man before, but he was wearing a gold hooded sweatshirt, with the hood pulled over his head. He could see "[t]he shaping of [the man's] face." Mr. Greer testified that the gun he saw was the same gun that the defendant had at Ms. Hudson's house. He said that when he spoke to police that night, he told them that he suspected the defendant. The police showed him a photo array, but he did not see the shooter in the photographs. His friend, Talone Mayes,[2] showed him a photograph of Timothy Cartwright, and Mr. Greer recognized Mr. Cartwright as the shooter. He took the photograph to Detective Fitzgerald. He further testified that he did not know anyone named Kelvin Burke.

On cross-examination, Mr. Greer testified that he became familiar with guns by watching his uncle, a gunsmith. He said that his understanding was that when the shooter came to the door, his daughter opened the door and closed it again when she went to tell her mother someone was asking for her. Mr. Greer said that he assumed the defendant was behind the shooting because he did not have any enemies, and the defendant was his wife's only enemy.

Natalie Broadway, a victim-witness coordinator for the district attorney general's office, testified that on March 21, 2006, the defendant had a court date regarding the telephone harassment warrant he had obtained against Mrs. Greer. After the court appearance, the defendant informed Ms. Broadway that someone had vandalized his vehicle while he was in court.

Kelvin Burke testified that he knew both the defendant and Mr. Greer. He said that the defendant offered him a few thousand dollars to shoot Mr. Greer, whom he knew as Shooby, because he felt that Mr. Greer was interfering with his visitation with his daughter. After the defendant called him to inquire whether he would accept the proposition, Mr. Burke told a homicide detective with the Metropolitan Nashville Police Department what the defendant had asked him to do. He said that he was concerned about being implicated if anything happened. After M.H. was killed, Mr. Burke saw the defendant again, and the

---

[2] Mr. Greer testified that Mr. Mayes was related to Tracy Mayes, whom Detective Fitzgerald interviewed regarding the defendant's alibi. Detective Fitzgerald testified that he saw Timothy Cartwright in Ms. Mayes' apartment.

defendant told him that he wished that Mr. Burke had taken the offer because Timothy Cartwright, also known as La T, "just did things all wrong because he was on that dope . . . ." Mr. Burke testified that the defendant told him, "I saw my baby open the door and that fool almost killed my own child." The defendant did not tell him how much he paid Mr. Cartwright. The defendant told him that the only thing the state had against him "was a cell phone," but his defense was that a friend of his had his cell phone.

On cross-examination, Mr. Burke agreed that he had convictions for especially aggravated burglary and smuggling contraband into a penal institution. He further agreed that authorities had revoked his parole, and he was awaiting his revocation hearing. He said that the district attorney general's office sent a letter to the parole board on his behalf to have his parole hearing moved to an earlier date. Mr. Burke said that he wrote several letters to various agencies and to the assistant district attorney general. He agreed that he told the assistant district attorney general who met with him that the defendant said that he rode with Mr. Cartwright to the Greers' house because Mr. Cartwright did not know where it was. Mr. Burke testified that the defendant told him that he saw his daughter through the door and that at some point Mr. Cartwright began shooting into the house.

On re-direct examination, Mr. Burke testified that in several of the letters, he said that he did not want special treatment for his information.

Sergeant Frank Ragains, with the Metropolitan Nashville Police Department, testified that he collected five shell casings from an area to the right of the Greers' front porch. He located five bullet holes in the Greers' front door. He found projectile strike marks inside the residence and recovered two projectiles. Sergeant Ragains testified that at least one projectile might have lodged in the victim's body, and he made the decision not to recover other projectiles lodged in the Greers' wall and sofa because recovering the projectiles would require him to tear up the wall and sofa.

Tennessee Bureau of Investigation Special Agent Steve Scott testified as an expert in firearms examination. He testified that the casings found outside the Greers' home and the projectiles found inside were .380 auto caliber bullets fired from the same firearm. He did not have a firearm with which he could make a comparison, but he said that Lorcin and Bryco-Jennings both made .380 auto pistols. He said that the rifling on the projectiles was consistent with pistols made by Lorcin, Bryco-Jennings, and others. Agent Scott testified that Lorcin and Bryco-Jennings made pistols that did not have hammers.

Dr. Amy R. McMaster testified as an expert in forensic pathology. She said that she works for Forensic Medical, a private company that contracts with Davidson County to provide death investigation services. Dr. McMaster testified that M.H. had two gunshot

wounds. One bullet entered the left side of his back and exited the right side of his chest. The second bullet entered the back side of his left thigh and exited the front of his left thigh. Dr. McMaster categorized the wound to his torso as fatal, but the wound to his thigh "would not necessarily have been fatal." She testified that M.H.'s cause of death was multiple gunshot wounds, and his manner of death was homicide.

Metropolitan Nashville Police Detective Eric Fitzgerald testified that in March 2006, he was a detective in the youth services division. He was responsible for investigating M.H.'s death. Monique and William Greer gave him the defendant's name as a suspect. From police reports filed by the defendant, Detective Fitzgerald obtained his home address and three phone numbers, two of which were cell phones. The cell phone numbers were 506-0736 and 715-5345. Detective Fitzgerald interviewed the defendant at his attorney's office. During the interview, Detective Fitzgerald observed that the defendant carried two cell phones. The defendant told him that he was playing cards with Eric Whitfield, Tracy Mayes, and Valencia Mathers when M.H. was killed. He interviewed all three alibi witnesses. Ms. Mathers was the defendant's sister. Ms. Mayes lived in the apartment below Ms. Mathers. When Detective Fitzgerald went to Ms. Mayes's apartment, a male was making breakfast in the kitchen. Detective Fitzgerald later learned that the male was Timothy Cartwright. Detective Fitzgerald obtained the records related to the defendant's 0736 number, and, after he learned that the defendant also had a cell phone with the number 715-5345, he obtained the records for that number as well. When he reviewed the records, the number 506-6781 appeared repeatedly. Detective Fitzgerald learned that the 6781 number belonged to Timothy Cartwright, and he obtained the records for that number also.

The cell phone records contained the locations of the cell phone towers used during each call. The detective prepared a map showing the locations of the cell phone towers used by the defendant's phone around the time of M.H.'s murder. Beginning at 8:05 p.m., the defendant's phone was using a tower near where the defendant lived. At 8:46, the phone hit off a tower on Lebanon Pike. Between 9:03 and 9:22 p.m., the phone was using a tower on New England Drive. Detective Fitzgerald testified that a person could see the cell tower on New England Drive from the Greers' front yard. He said that the murder occurred at approximately 9:20 p.m. Detective Fitzgerald testified, "[The map] shows a track over to the murder site[,] there for around 30 minutes around the time of the murder[,] and coming back for the rest of the night." Detective Fitzgerald said that two of the defendant's phones were used in that time period. He said that the records showed the defendant making three calls to his sister during that time. Timothy Cartwright's cell phone records showed that his phone traveled the same path as the defendant's, but he turned his phone off from 8:50 p.m. until 10:30 p.m. The first call that Mr. Cartwright made after turning the phone back on was to the defendant.

Detective Fitzgerald said that neither Mr. Greer nor the defendant and Mrs. Greer's daughter were able to identify Mr. Cartwright in a photo array. Mr. Greer later came to him with a photograph of Mr. Cartwright and said that he was the man who shot his nephew. Detective Fitzgerald said that he came into contact with Kelvin Burke in connection to another case. In the course of interviewing Mr. Burke, he asked him whether he was familiar with the defendant or Timothy Cartwright. Mr. Burke indicated that he was and that he had information about M.H.'s murder.

On cross-examination, Detective Fitzgerald testified that he investigated two other men in connection with the murder. One man was in jail when it occurred, and he was unable to find a link between the second man and the murder. He executed a search warrant for the second man's apartment and located a brown sweatshirt but nothing else that might connect him to the murder. Detective Fitzgerald said that the cell phone records did not reveal whether a phone used a particular tower because the closest tower was "max[e]d out." He agreed that he interviewed a third person, Mr. Patrick Hancock, in the course of the investigation who used a cell phone that was in the defendant's name with the number 586-7332. Regarding his interaction with Kelvin Burke, Detective Fitzgerald said that Mr. Burke wrote to him asking whether his parole hearing could be moved to an earlier date.

On re-direct examination, Detective Fitzgerald testified that there were twenty-four phone calls between the defendant and Timothy Cartwright from 10:25 p.m. on March 21 through March 22. He said that he executed a search warrant for Mr. Cartwright's residence and located a brown hooded sweatshirt.

On re-cross-examination, Detective Fitzgerald agreed that the cell phone records did not show who was actually using the phone in question.

Following the close of proof and deliberations, the jury found the defendant guilty of first degree felony murder for the killing of M.H. in the attempt to kill another. The defendant received a life sentence in the Tennessee Department of Correction.

## Analysis

On appeal, the defendant argues that (1) the trial court denied his right to counsel at his motion for new trial hearing; (2) the evidence was insufficient to support his conviction; (3) the trial court erred by admitting evidence of the defendant's prior bad acts; and (4) the trial court erred by allowing a lay witness to provide expert testimony.

*Right to Counsel*

For his first issue, the defendant alleges that the trial court denied his right to counsel at the hearing on his motion for new trial. The state responds that the defendant waived the issue by failing to appropriately reference the record and by not including a transcript of the motion for new trial hearing in the record.

"Both the United States and Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of appointed counsel at trial." *State v. Carruthers*, 35 S.W.3d 516, 546 (Tenn. 2000) (citing U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *Martinez v. Court of Appeal of California*, 528 U.S. 152 (2000); *Gideon v. Wainwright*, 372 U.S. 335 (1963); *State v. Small*, 988 S.W.2d 671, 673 (Tenn. 1999); *State v. Northington*, 667 S.W.2d 57, 60 (Tenn. 1984); *see also* Tenn. R. Crim. P. 44(a)). "[T]he wrongful deprivation of a criminal defendant's right to counsel is a structural error which so contaminates the proceeding that reversal is mandated." *State v. Holmes*, 302 S.W.3d 831, 838 (Tenn. 2010). "The right of an accused to assistance of counsel, however, does not include the right to appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel." *Carruthers*, 35 S.W.3d at 546.

If an indigent defendant does not want appointed counsel, Tennessee Supreme Court Rule 13 provides that he or she must refuse the services of appointed counsel in writing and sign the written refusal in the presence of the court. If appointed counsel wishes to withdraw from representing a defendant, the Tennessee Code Annotated provides that a trial court may permit appointed counsel to withdraw for good cause shown, and the code requires that a court immediately appoint a substitution if it allows appointed counsel to withdraw. Tenn. Code Ann. § 40-14-205. The decision to permit or deny withdrawal is left to the sound discretion of the trial court, and this court will not overturn such a decision absent an abuse of discretion. *See State v. Branam*, 855 S.W.2d 563, 566 (Tenn. 1993).

In this case, the defendant claims that he dismissed his attorney before the trial court heard his motion for new trial, and the trial court did not appoint new counsel until after denying the motion, thereby denying the defendant's right to counsel during the hearing. The record shows that trial counsel filed a motion for new trial on August 12, 2008. The defendant filed a *pro se* motion for new trial on October 9, 2008, that contained allegations of ineffective assistance of counsel. The trial court minutes for October 10, 2008, state that the trial court heard and took under advisement the motion for new trial, although it does not reveal *which* motion for new trial. The trial court minutes for October 24, 2008, state that the trial court heard and denied the motion, relieved trial counsel, and appointed new counsel for the defendant's appeal. The record further shows that the defendant filed a second *pro se* motion for new trial on December 23, 2008. The trial court denied this motion, ruling that the court had previously determined the matter on October 24.

The record does not contain a transcript of any of the aforementioned motion for new trial proceedings. Nothing in the record indicates that the defendant refused the services of his appointed counsel in writing and signed the written refusal in the presence of the court. Nor does the record show that the defendant moved the court to dismiss his counsel and appoint a substitute. Finally, the record does not show that the trial court heard the defendant's motion for new trial after allowing trial counsel to withdraw and before appointing new counsel. It is the duty of the accused to provide a record which conveys a fair, accurate, and complete account of what transpired with regard to the issues which form the basis of the appeal. Tenn. R. App. P. 24(b); *see State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999). Therefore, we must conclude that the defendant has not shown that the trial court heard his motion for new trial while he was not represented by appointed counsel. He is without relief as to this issue.

*Sufficiency of the Evidence*

The defendant contends that the evidence was insufficient to support his conviction because, he alleges, the state did not prove that the defendant was criminally responsible for the acts of the individual who killed M.H.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

Although the evidence of the defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987); *State v. Gregory*, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). However, in order for this to occur, the circumstantial evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with innocence and must exclude every other reasonable theory or hypothesis except that of guilt. *Tharpe*, 726 S.W.2d at 900. In addition, "it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime." *Id.* (quoting *Pruitt v. State*, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)).

The jury convicted the defendant of the first degree murder of M.H. in the attempt to perpetrate the first degree murder of another person. Therefore, the state had to prove that the defendant or one for whom he was criminally responsible killed M.H. while attempting to kill another person. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id.* § 39-11-401(a). A person is criminally responsible for the conduct of another when "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2).

The evidence at trial, taken in the light most favorable to the state, showed that the defendant held William Greer responsible for the problems he had related to visitation with his daughter. The testimony of Kelvin Burke, apparently accredited by the jury, established that the defendant wished to hire someone to kill Mr. Greer and that the defendant was unhappy that the person he chose to kill Mr. Greer did not act in the way the defendant expected him to act. The cell phone records indicated that, at the time of the murder, the defendant was not playing cards with his sister as he told Detective Fitzgerald. Instead, he traveled in the direction of the Greers' home before the murder and returned to his own residence after the murder. Furthermore, Mr. Greer's testimony linked the weapon used by the shooter to the defendant because he testified that it was the same weapon that the defendant had previously pulled on him. The defendant urges this court to discount the testimony by Mr. Burke and by the Greers, but credibility of witnesses is an issue for the trial jury and not this court. We conclude that the evidence was sufficient for a reasonable jury to find that the defendant was criminally responsible for the person who killed M.H. The defendant is without relief as to this issue.

*Rule 404(b)*

-10-

For his third issue, the defendant contends that the trial court erred by allowing the state to introduce evidence of a prior bad act. Specifically, the defendant argues that the trial court did not hold a proper hearing as required by Tennessee Rule of Evidence 404(b) because the court ruled on the admissibility of the evidence without hearing argument from the defendant. The state responds that the trial court complied with Rule 404(b) and did not abuse its discretion in finding that the evidence was admissible.

Pursuant to Tennessee Rule of Evidence 404(b), evidence of other crimes, wrongs, or acts is generally not admissible "to prove the character of a person in order to show action in conformity with the character trait." The rationale underlying this rule is that the admission of such evidence carries with it the inherent risk of the jury convicting the accused of a particular crime based upon his bad character or propensity to commit the crime rather than the strength of the evidence. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the accused's other bad acts are similar to the crime for which the accused is on trial. *Id.*; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996). Nonetheless, evidence of other crimes, wrongs or acts may be admissible where it is probative of a purpose other than the accused's propensity. Tenn. R. Evid. 404(b). Although Rule 404(b) does not explicitly list the exceptions under which evidence of prior crimes, wrongs, or acts may be admitted, our courts have held that such evidence may be admissible to show another purpose such as: motive, intent, guilty knowledge, identity of the defendant, absence of mistake, or the existence of a common scheme. *See*, *e.g.*, *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004); *Collard v. State*, 526 S.W.2d 112, 114 (Tenn. 1975). To admit such evidence, Rule 404(b) specifies the following:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Should a review of the record indicate that the trial court substantially complied with the requirements of Rule 404(b), the trial court's admission of the challenged evidence will remain undisturbed absent an abuse of discretion. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

-11-

In this case, the state requested a jury-out hearing during Iola Hudson's testimony in order for the trial court to rule on the admissibility of her testimony that the defendant pulled a gun on William and Monique Greer. During that hearing, Ms. Hudson detailed the specifics of the incident, and the state proffered that the testimonies of the Greers would essentially present the same facts. Defense counsel argued that "[he did not] know what that goes to as far as proof in this case [because] [i]t happened in 2005." The state responded that the evidence showed intent, premeditation, and animosity between the parties. The trial court agreed with the state and found that the probative value of the evidence outweighed the prejudicial effect.

Upon review of the record, we conclude that the court fulfilled the necessary prerequisites to permit it to rule on potential 404(b) evidence. Specifically, the court held a jury-out hearing to determine whether a material issue existed for the admission of the evidence other than proving conduct conforming with a character trait. After argument by *both* parties, contrary to the defendant's argument on appeal, the court concluded that the state offered the testimony to prove the animosity between the parties and the defendant's premeditation. We detect no abuse of discretion by the trial court in allowing the testimony of Iola Hudson and William and Monique Greer. Therefore, we conclude that the defendant is without relief as to this issue.

*Expert Testimony*

The defendant's final issue is that the trial court erred by admitting expert testimony from a lay witness. The defendant argues that Detective Fitzgerald's testimony regarding cell phone towers was based on specialized knowledge that went beyond allowable lay opinion testimony. The state responds that Detective Fitzgerald's testimony was based on his personal knowledge and was not expert testimony.

Initially, we note that the defendant failed to include this issue in the motion for new trial prepared by trial counsel and in his *pro se* motion for new trial. Therefore, he has waived this issue. Tenn. R. App. P. 3(e); *see State v. Walker*, 910 S.W.2d 381, 386 (Tenn. 1995). Nonetheless, in the interest of future review, we conclude that Detective Fitzgerald's testimony was not expert testimony.

Tennessee Rule of Evidence 701 provides:

If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1) rationally based on the perception of the witness and

(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

The detective merely testified that he saw the locations of the cell phone towers listed on the cell phone records and plotted those locations on a map. He inferred that the defendant traveled near those towers. Detective Fitzgerald explicitly stated that he was not an expert in how the cell phone towers worked. We conclude that a layperson could plot the locations of the towers on a map and draw the same inference; therefore, his testimony did not require specialized knowledge as contemplated by Tennessee Rule of Evidence 702, which governs expert testimony, and the trial court did not err by allowing the testimony.

**Conclusion**

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE